**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**DEBRA FLETCHER**                                                    **PLAINTIFF**

**VS.**                                              **CAUSE NO. 1:11CV194LG-JMR**

**GULFSIDE CASINO, INC., doing**
**business as Island View Casino Resort**                  **DEFENDANT**

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This is an employment discrimination case, in which Plaintiff, Debra

Fletcher, claims that she was terminated from her position as a Slot Floorperson at

the Island View Casino Resort because of her age, in violation of the Age

Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (2000). The case

is currently before the Court on Defendant's Motion for Summary Judgment [Doc.

#23] and Plaintiff's Motion for Leave to File Surreply in Opposition to Defendant's

Motion for Summary Judgment [Doc. #32]. The Court has reviewed these Motions

and the related pleadings, as well as the record, and, for the reasons more fully set

out below, this Court finds that there are no genuine issues of material fact that

support Plaintiff's claims and, therefore, that the Motion for Summary Judgment

should be granted and the claims dismissed with prejudice. The Court further finds

that the Plaintiff's Motion for Leave to File Surreply should be denied.

**Undisputed Facts**

The parties agree upon the following facts relevant to this decision. Plaintiff,

Debra Fletcher, began working for Defendant, Island View Casino Resort, in

September, 2006, when she was fifty-four years old. She was terminated on August 9, 2010, when she was fifty-eight years old. Fletcher was hired shortly after Hurricane Katrina, when the Gulf Coast's labor force was small. Fletcher was hired full-time and made $10.50 an hour. By the time that Fletcher was terminated, the labor force had increased, and new hires at that point made $9.00 per hour and worked part-time. Fletcher's immediate supervisor at the time that she was fired was Melanie Leighton. On the day that Fletcher was fired, Leighton reported to the Slot Director, Chad Dugger, that Fletcher had been smoking in one of the public restrooms, in violation of company rules. This was given as the reason for Fletcher's termination.

The parties also agree that Fletcher's personnel file contained several Disciplinary Action Records. They can be divided into two categories – violations of Island View's attendance policy and instances of poor performance. DAR's given for violation of the attendance policy were assigned a point value. An employee would be given a verbal warning after three points, a written warning after six points, a final warning after nine points, and an employee who accumulated twelve points in a twelve month period would be terminated. Every attendance-related DAR would expire twelve months after it was given. It is undisputed that all of Fletcher's attendance-related DAR's had expired by the time of her termination.

DAR's related to poor job performance were also handled in a progressive manner. An employee could be given a verbal warning, a written warning, and a suspension, or final warning, before being discharged. The level of warning was

apparently discretionary with management, depending upon the severity of the offense. DAR's related to poor job performance did not expire and remained in the employee's personnel file, to be considered in management's discretion for making employment decisions. At the time that she was discharged, the following performance-related DAR's were in Fletcher's file:

1.  DAR (Final) on June 11, 2008, for poor work performance for losing control of assigned machine keys (this was considered a Final Warning because it followed two previous DAR's related to attendance);

2.  DAR (Verbal) on March 6, 2009, for poor job performance for not responding to calls for assistance;

3.  DAR (Verbal) on March 11, 2009, for poor job performance for failing to properly complete a jackpot receipt;

4.  DAR (Written) on April 7, 2009, for poor job performance for failing to properly complete a jackpot receipt;

5.  DAR (Final) on August 10, 2009, for poor job performance for failing to attend a mandatory training session.

Fletcher claims that the motivation for these DAR's was discriminatory and that she was also subjected to verbal harassment because of her age. Island View's Employee Handbook advises employees who are being harassed to "tell the harasser that his/her actions are not welcome and they must stop" and to "report the specific incident of harassment to your supervisor, department head or the Director of Human Resources Immediately." Fletcher did not make any formal complaint to the Human Resources Department about the disciplinary reports in her file or the

verbal harassment, although she does contend that she discussed them with Steve Whitten and Nancy Kyle, who were formerly her supervisors.

Fletcher also contends, and Island View admits, that she was discussed during a management meeting on July 23, 2010, shortly before her termination. This meeting was the subject of a conversation between Fletcher and Whitten a few months after her termination. She has presented the Court with a CD that purports to contain that conversation, which she secretly recorded. According to her deposition, the conversation occurred in January, 2011, which was several months after Fletcher was terminated. Fletcher and Whitten were social friends, and the conversation seems to have taken place in an automobile. It appears that the first knowledge Island View had of this recording was when Fletcher described it during her deposition in January, 2012, at which time counsel for Island View expressed his desire for a copy. The recording was not mentioned during Whitten's deposition a month later.

Other than the statements that Fletcher made during her deposition, the Court finds nothing in the record that would authenticate this recording; however, Island View has not requested that it be excluded from consideration. The Court has listened to the recording, in which Fletcher made repeated attempts to get Whitten to state that she was terminated because of her age. Those attempts consisted of asking leading questions, cajoling, and, essentially, telling her version of what happened and attempting to get Whitten to agree. At one point in the discussion, Fletcher reminded Whitten that he had described Dugger's hiring

philosophy as "out with the old and in with the new." Whitten acknowledged that Dugger tended to hire younger people. Later, Whitten described the meeting that occurred just prior to Fletcher's termination, where he reported that Dugger said, "[H]ere are these names, what can we do about these names? Let's do something about this." Another exchange followed:

FLETCHER:      Well, I'm older now, and, me and Nancy talked
               about it forever, and I know I got fired for my age.
               We all know that.

WHITTEN:       No, I don't . . . .

FLETCHER:      You just don't want to admit it.

WHITTEN:       No, I just don't believe that.

FLETCHER:      Well, I don't know. Why would you say, "Out with
               the old and in with the new?" And make comments
               about everybody that he's hiring?

WHITTEN        Not old as in age – old as in "original people."

FLETCHER:      What's wrong with that?

WHITTEN:       Because a $9 person is much cheaper than a $10.50
               an hour person. Can bring them in at 24 or 32
               hours a week. They're all part-time and $9.

At a later point in the conversation, Fletcher speculated that another employee would also lose her job because of her age, and Whitten replied, "Well, again, it's, it's not – you're hung up on the age thing and it may have some truth, but it's not just age. It's – you're not at a certain level, and if you're not, you're not at the next level, without being at that level yet, watch out!" Whitten went on to explain that Fletcher could not move up to the next level because she couldn't run dispatch.

Finally, Whitten said that he thought that it was only Dugger who contrived to have her fired and that Leighton was likely not part of any conspiracy.

In his deposition, Whitten described Dugger's comments about Fletcher at the July 23, 2010, meeting as follows:

> [t]hat she was at the bottom, one of – one of the two or three at the bottom of the list. And he was kind of just presenting to [sic] that to us, the other shift managers, as to what we needed to do to either get her up to speed or – or something else; what are we gonna do with – with those two that are at the bottom of the list? Which is a common practice in the – in the shift meeting: How are we going to bump these people up to get them up to speed to where they need to be? And that's where that conversation came in.

Whitten was asked whether there was a discussion about terminating Fletcher, and he said, "No." Another employee who attended the meeting, Nancy Kyle, summarized the discussion of Fletcher in her deposition testimony as, "[W]e just need to kind of help them along and get them a little bit up to speed more . . . ."

In the months before and after Fletcher was terminated, Island View hired several people into the slot department. According to its Responses to Interrogatories, from August 5, 2009, until August 4, 2010 (pre-termination), Island View hired or transferred the following people into the slot department:

| Name | Age | Date of Hire/Transfer |
|------|-----|----------------------|
| Jackie Yarbrough | 30 | 08/05/2009 |
| Casey Wilson | 25 | 08/19/2009 |
| Mary Kontur | 22 | 09/02/2009 |
| Leta Whitworth | 52 | 12/24/2009 |
| Kenji Davis | 29 | 04/28/2010 |
| John Foster | 39 | 04/28/2010 |
| Teresa Barraco | 34 | 05/12/2010 |
| Brandon Winstead | 23 | 08/04/2010 |

From August 11, 2010, until December 7, 2011 (post-termination), Island View
hired the following people:

| | | |
|---|---|---|
| Howard Fortenberry | 53 | 08/11/2010 |
| Billy Ladner | 35 | 09/14/2010 |
| Susan Nelson | 47 | 11/17/2010 |
| Eric Schmieder | 35 | 11/24/2010 |
| Melvin Cheeley | 23 | 11/24/2010 |
| John Thomas, III | 42 | 02/23/2011 |
| Amanda Graham | 37 | 04/13/2011 |
| Chelsea Carlson | 33 | 07/13/2011 |
| Rebekah Bushart | 28 | 07/20/2011 |
| Nicole Burch | 25 | 09/14/2011 |
| Mary Toups | 47 | 09/14/2011 |
| William Johnson | 28 | 12/07/2011 |

When asked during his deposition which employee replaced Fletcher, Dugger
testified that the practice of keeping "floating" requisitions open made it difficult to
identify any particular employee as her replacement. Referring to the list above, he
testified that either Fortenberry or Ladner was her replacement. Nancy Kyle
testified in her deposition that, because Fletcher's position was on the day shift,
employee on the other shifts would be given the opportunity to move up to that
position, on the basis of seniority, after which someone would be hired externally.

After briefing was completed on this Motion, Fletcher sought leave to file a
Surreply to identify the employee who took her place. According to the proposed
pleading, Fletcher "learned" that an employee named Candy Johnson moved from
swing shift to day shift to replace her. Island View opposes the filing of this
pleading because it is untimely and not based upon any disclosed evidence.
Fletcher has not responded to this opposition. The Court is of the opinion that this

Motion should be denied on the grounds asserted by Island View. Additionally, if this person was transferred to fill Fletcher's position under the mechanism described by Ms. Kyle, then it appears that the move would have been based upon her seniority, making this information irrelevant to the issue of age discrimination.

Fletcher applied for unemployment benefits after her termination. Island View opposed the application, contending that Fletcher was discharged for misconduct, and the Mississippi Department of Employment Security initially denied benefits to Fletcher. An Administrative Law Judge held a telephonic hearing on Fletcher's appeal, at which Deanna Ladner, an Employee Relations Coordinator for Island View, Leighton, and Dugger participated on behalf of Island View. Ladner submitted a summary of Fletcher's disciplinary record that indicated that she missed a mandatory meeting on August 10, 2010, the day after she was terminated. Ladner admitted during her deposition that the entry was in error, as Fletcher actually missed the meeting on August 10, 2009.

Fletcher claims that Island View defamed her during the hearing by presenting false testimony through Dugger, Leighton and Ladner, as well as by presenting a report made by Leighton, describing a confrontation with Fletcher at another casino after Fletcher was fired. The two women give completely different accounts of that meeting. According to Fletcher, she approached Leighton, and the following exchange took place:

> I said, "Well Melanie, hey, how you doing?" Well, she looked up at me, and then she looked back down. I said, "Oh, you're not going to speak to me?" She said, "Pique [Fletcher's maiden name], don't you come

8

around me starting no shit." And I said – I said, "Melanie, I'm not the one that started anything." I said, "I was just wondering if you sleep good at night," and I turned around and I walked off.

Leighton's version of the meeting is recorded in a Witness Statement that she made to Treasure Bay's Security:

I was sitting at a slot machine at 21:00 when Debra (Pique) Fletcher approached me and said "I heard your stupid ass was here – I hope you can sleep at night Bitch – we have my unemployment hearing coming up so if you're ready to rumble Bitch we'll fucking rumble." I then asked, "What are you talking about." Debra replied, "It's on Bitch – I said what I needed to say." She then walked away. This is an ex employee from Island View Casino. I was recently her manager.

According to Ladner, she submitted Leighton's statement because "I wanted to enter that in as part of, say, character. It shows what point she was at." When questioned further as to whether Fletcher's character was relevant to the MDES hearing, Ladner said, "I put everything in there. Part – every record that I had, I submitted it." She testified at her deposition that she believed that it was important for the hearing officer to see the information. The hearing officer deemed the statement irrelevant and did not allow it to be entered into evidence.

Fletcher submitted to the ALJ an affidavit from a former Island View employee that stated that employees were often permitted to smoke in the public restrooms if the casino was busy. That witness also stated that he had smoked in non-designated locations with members of management, including Dugger. Another former employee appeared personally on Fletcher's behalf, and she also testified that the smoking policy was not routinely enforced. The ALJ reversed the earlier decision denying benefits, concluding:

The decision is made on the weight of evidence. The claimant received previous warnings but several of those warnings were due to mistakes. There is no evidence of misconduct due to merely making a mistake since there was no willful intention shown. The evidence of record shows that the rules regarding smoking were not uniformly or consistently enforced. It also applies that the rules regarding mistakes in completing paperwork for jackpot were not uniformly enforced.

There is sufficient evidence of record to cast a substantial doubt as to whether the rules and policies regarding smoking while on duty were uniformly enforced. The employer has failed to prove that the claimant's actions constitute a willful or wanton disregard of the employer's interests. Without proof of work related misconduct, a disqualification of benefits is not justified.

Fletcher also asserts that, on December 10, 2010, Island View entered into a Negotiated Settlement Agreement with the Equal Employment Opportunity Commission relative to the age discrimination charges brought by Fletcher, and she has provided a copy of it to the Court. Island View characterizes the document as "a proposed agreement that is not signed by both the EEOC and a representative of the Island View . . . ." The Court has reviewed the document, however, and it was signed by a representative of the casino. As part of that Agreement, Island View agreed to the following provisions:

A.   Within 30 days of the full execution of the Agreement Respondent agrees to re-issue its Anti-Discrimination and Anti-Harassment Policies as it pertains to the complaint and reporting procedures.

B.   Continue to provide training on Anti-Discrimination and Anti-Harassment policies for all employees, including managers within 45 days of executing this agreement.

C.   Continue to comply with the non-retaliation provisions of its policies and those of the EEOC.

D. Continue to visibly post the EEOC Notice required by law and their EEO Policy Statement in an area frequented by employees and applicants for employment.

The Agreement states that Island View's commitment to take these actions "does not constitute an admission by the Respondent of any violation of the Age Discrimination in Employment Act of 1967."

There are also disputed factual issues raised by the parties, such as whether Dugger both hired and fired Fletcher. A finding that he did might entitle Island View to the presumption that, because he hired Fletcher when she was fifty-four, his terminating her when she was fifty-eight was not based on age. Fletcher disputes Island View's contention that Dugger actually hired her. Resolution of this issue is not necessary in order to render an opinion in this matter.

**Standard for granting summary judgment**

The familiar standard for the entry of summary judgment comes from Fed. R. Civ. P. 56(a), which requires its entry "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party "bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). With this standard in mind, the Court will review Fletcher's

claims of age discrimination, harassment based on her age, and defamation. Fletcher has withdrawn her claim for intentional infliction of emotional distress.

## Age Discrimination

The Age Discrimination in Employment Act (ADEA) makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). The Supreme Court has interpreted that provision as meaning that the plaintiff "must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Thus, unlike Title VII cases, where the burden shifts to the defendant after the plaintiff shows that unlawful discrimination was a motivating factor in the employment decision, in ADEA cases, the burden to establish that age was the determinative factor remains with the plaintiff. *Id*. at 177. In an ADEA case, therefore, "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id*. at 180.

A plaintiff may prove employment discrimination either by direct or circumstantial evidence. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010). Where the claim is based, as here, on circumstantial evidence, although the burden of proof does not shift, the burden of production does. *Id*. at 378. "To establish a prima facie case of age discrimination, 'a plaintiff must show

that (1) he was discharged; (2) he was qualified for the position; (3) he was in the protected class at the time of the discharge; and (4) he was either (i) replaced by a someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of age." *Id*. (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)). *But see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (holding that whether employee is replaced by someone in the protected class is irrelevant; question is whether replacement is significantly younger). Once the plaintiff alleges a prima facie case of age discrimination, the employer has the burden of producing a legitimate, non-discriminatory reason for the termination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). If the employer provides such a reason, then the plaintiff must be permitted to prove that the proffered reason is merely a pretext for discrimination. *Id*.

Here, there is no dispute that Fletcher was within the protected class and was discharged from a job for which she was qualified. It is questionable, however, whether Fletcher has demonstrated that she was replaced by a substantially younger person. As stated earlier, it is difficult to determine who actually replaced Fletcher. She admits in her Response to the Motion for Summary Judgment that, based upon the list of persons hired or transferred into the slot department, "three possibilities arise: Brandon Winstead, age 24 (transferred into slots effective 8/4/2010); Howard Fortenberry, age 54 (official hire date 8/11/2010), or Billy Ladner, age 35 (transferred into slots effective 9/15/2010)." While she speculates that it could have been Winstead or Ladner, she offers no evidence that either

employee replaced her. Given, however, the requirement that the Court view the facts in favor of the non-moving party, the Court determines that Fletcher has made out a prima facie case of age discrimination.

Island View has countered this evidence with its explanation that Fletcher was discharged for a violation of company policies. It is undisputed that, on the day that Fletcher was discharged, Melanie Leighton reported to Chad Dugger that Fletcher was smoking in a public restroom, which violated Island View's employee policies. Fletcher admits that this was the reason given for her termination. Her file contains a series of disciplinary reports, the last being a Final Warning. According to Island View's progressive discipline policy, the next step in discipline actions was termination, as is indicated on the Final Warning, "Debra is receiving a Final Written Warning for Poor Job Performance. Further violations of this nature will result in termination." Dugger testified in his deposition, "Miss Fletcher got terminated for violation of company policy, for smoking in the rest rooms [sic], in conjunction with her poor job performance record in its entirety." Since Island View has offered a non-discriminatory reason for Fletcher's termination, she must prove that the reason is a pretext and that she was terminated as the result of her age.

Fletcher offers the following evidence that her termination was based upon her age: age-related remarks made to her by Island View managers; disparate treatment in the disciplinary process; and falsity of the final accusation that she smoked in a public restroom. With regard to the first argument, Fletcher maintains

that the many age-related comments that she has asserted are sufficient to show that age was the determinative factor in her discharge. The Court disagrees.

When asked at her deposition about the substance and frequency of those remarks, she testified that they occurred primarily in the last eighteen months prior to her discharge. Al Munoz, her former supervisor, and the one who issued many of the disciplinary records in her employee file, made comments about it being "Seniors Day" or "Blue Hair Day" when he saw her and another employee about her age. She testified that she interpreted the remarks as referring to her and the other employee, rather than the clientele of the casino. She testified that Florence Sadourny, another supervisor, would say, "You need your glasses?", or "Maybe you all need to get a walker, bring a walker."

Fletcher was actually discharged by Chad Dugger. In her deposition, she testified that Dugger asked, "Did you take your Geritol today?" or asked whether she had her glasses or hearing aid on. She couldn't remember how many times these remarks were made, but estimated at one point in her deposition that it was somewhere between three to five times in her last two years of employment. Later, she said that he might have asked about her hearing aid seven times. She also testified that Dugger referred to her as "old Copa" and referred to days when she and another older employee worked together as "Seniors Day."

"[S]o long as remarks are not the only evidence of pretext, they are probative of discriminatory intent." *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003). Fletcher also argues that she was disciplined more severely than other

15

workers and that the reason given for her termination was actually false.  She also maintains that a review of Island View's hiring practices supports her case of age discrimination.

Fletcher has never denied committing the infractions for which she received disciplinary notices, including losing the technical control of assigned machine keys, completing jackpot slips improperly, and failing to attend a mandatory meeting. She argues that other employees were not disciplined for committing those infractions under the same circumstances as she was.  In other words, she claims that no one else was disciplined after improperly completing only one jackpot slip in a shift or for missing a mandatory meeting, as long as they attended the next session.  Unfortunately, Fletcher has not put forward any evidence that younger employees committed the infractions that were charged to her, under the same circumstances, and were not disciplined for them.  To use disparate treatment as evidence of age discrimination, Fletcher must show that the circumstances involving the persons to whom she compares herself were sufficiently similar to hers and that those employees were younger than she.  *Lee v. Kansas City S. Ry. Co.*, 574 F. 3d 253, 259-60 (5th Cir. 2009).  At best, her argument is that, of the Island View managers who were deposed – Dugger, Whitten, Leighton, and Kyle – none actually identified an employee other than Fletcher who was disciplined for the same violations.  That argument begs the point–it is not Island View, but Fletcher, who bears the burden of showing that younger employees were treated more favorably than she was.  *Gross*, 557 U.S. at 176.  Fletcher has failed to do so.

16

Fletcher also contends that the meeting that was held on July 23, 2010, was for the purpose of letting the managers know that she had to be terminated, thereby setting up the conditions under which she was falsely accused of smoking in the restroom. There is no evidence to that effect. Nancy Kyle testified that Fletcher was discussed at the meeting, but in the context of "getting her up to speed." According to Kyle, managers "had to help Pique on a lot of different things." She stated further, "[A] lot of things that she should have known, she didn't know." While there were other employees who needed help, "Pique seemed to be having more – a lot more problems than some of the other people were." Steve Whitten testified that Fletcher was discussed because she was "at the bottom of the list." He also said that Dugger asked what could be done to "get her up to speed." Whitten testified that there was no discussion of terminating Fletcher at that meeting. In the conversation that Fletcher secretly recorded, Whitten's remarks were basically the same, "[Dugger] said 'here are these names, what can we do about these names, let's do something about this.'" Whitten emphasized in that unguarded conversation that he did not believe that Fletcher's termination was because of her age, but because of her pay rate, her lack of training for advancement, and, possibly, some personal feeling that Dugger had about her.

Fletcher advances the number of young people hired into the slot department as other evidence of age discrimination, pointing out that, in the year prior to her termination, seven people were hired into the department, only one of whom was over forty. In the seventeen months after she was discharged, Island View hired

thirteen slot attendants, only four over the age of forty, and only one the same age or older than her. This evidence does not prove age discrimination. Statistical evidence regarding the ages of persons hired into Fletcher's position are not probative unless they are compared to the ages of persons in the pool of applicants. *Wards Cove Packing Co., Inc. v. Antonio*, 490 U.S. 642, 652 (1989); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 311-12 (1977); *Tratree v. BP N. Amer. Pipelines, Inc.*, 390 F. App'x. 386, 389-90 (5th Cir. 2010); *Scott v. Univ. of Miss.*, 148 F.3d 493, 510 (5th Cir. 1998), *rev'd on other grounds, Kimel v. Fla. Bd. of Regents*, 428 U.S. 62, 72 (2000); *Scales v. Slater*, 181 F.3d 703, 709 n.5 (5th Cir. 1992). Absent any proof to the contrary, it could be the case that Island View hired every older worker who applied.

Fletcher also argues that she was actually terminated for a reason that was untrue. She argues that she was not smoking in the restroom, that Leighton, who reported her, could not have seen her if she was, and that the smoking policy was not uniformly enforced. On the last point, she relies on the report issued by the Mississippi Department of Employment Security (formerly the Mississippi Employment Security Commission) granting her benefits on that basis. The argument is not persuasive. Mississippi law provides that an employer's experience rating record will be chargeable with benefits paid to a former employee, unless he left with good cause, was discharged for misconduct, or refused an offer of suitable work. Miss. Code § 71-5-365 (1972 & Supp. 2011). Mississippi law also requires the employer to bear the burden of proving misconduct where the employee was

discharged.  Miss. Code § 71-5-513(A)(1)(c) (1972 & Supp. 2011).  Misconduct is

defined as follows:

> The meaning of the term "misconduct," as used in the Unemployment
> Compensation Statute, is conduct evidencing such willful and wanton
> disregard of the employer's interest as is found in deliberate violations
> or disregard of the standards of behavior which the employer has a
> right to expect from his employees.  Also, carelessness and negligence
> of such degree, or recurrence thereof, as to manifest culpability,
> wrongful intent or evil design, and showing an intentional or
> substantial disregard of the employer's interest or of the employee's
> duties and obligations to his employer, came within the term.  Mere
> inefficiency, unsatisfactory conduct, failure in good performance as the
> result of inability or incapacity, or inadvertencies and ordinary
> negligence in isolated incidents, and good faith errors in judgment or
> discretion were not considered misconduct within the meaning of the
> Statute."

*Wheeler v. Arriola*, 408 So.2d 1381, 1383 (Miss. 1982); *see also Miss. Emp't. Sec.*

*Comm'n v. Harris*, 672 So. 2d 739, 742 Miss. 1996).

The ALJ's decision was based upon the law that must be applied to a claim

for unemployment compensation.  An employee's conduct may justify termination,

but not rise to the level of misconduct as recognized by MDES.  *Coahoma Cnty. v.*

*Miss. Emp't Sec. Comm'n*, 761 So. 2d 846, 850 (Miss. 2000).  Based on the evidence

presented to her, the ALJ found that Island View had not proved misconduct.  In

making that holding, she apparently found that Fletcher was smoking in the

restroom, but that, in the absence of a regularly enforced policy to prevent it, that

act did not arise to misconduct.  That finding does not show that Fletcher was "set

up" for a smoking violation in order to discharge her because of her age.

No one disputes the fact that Melanie Leighton notified Dugger that Fletcher was smoking in the restroom. Perhaps Dugger should have investigated more fully; perhaps he should have called Fletcher in to get her side of the story. The question, however, is not whether the employer made an erroneous decision, but whether the plaintiff would not have been discharged but for her age. *Gross,* 557 U.S. at 176 ; *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (employer's decision may be erroneous, but still not violative of ADEA).

The only remaining evidence of age discrimination is the collection of remarks that Fletcher claims were made about her age, and these are insufficient to support a claim of age discrimination. Even Fletcher could not say for certain that all of the remarks were directed at her age; she admitted that the term "old Copa" could have referred to the fact that she was part of a group of employees that came from the old Copa casino to Island View. The references to her glasses could have been just that; she admitted that she needed her glasses to read, and some of her disciplinary records were based upon mistakes made in filling out forms. "Senior Day" and "blue hairs" were terms used by employees to refer to the older patrons of the casino; even Whitten, in the secretly recorded conversation with Fletcher, stated that he transferred from day to swing shift partly to get away from the "blue hairs."

The Court is of the opinion that no reasonable juror could look at the evidence surrounding the decision to terminate Fletcher and conclude that it was based upon age. A substantial motivating factor was likely her pay rate and full-time status, as she tacitly admitted during her deposition, when she said, "I

believe–what I believe is if he wanted to replace a 10.50-an-hour employee with a $9-an-hour employee, that I got chosen because of my age." The fact that another, non-discriminatory reason may have prompted Fletcher's discharge does not create a factual issue as to whether she was terminated because of her age. *Reeves*, 530 U.S. at 148. Because there is no genuine issue of material fact on the issue of age discrimination, summary judgment is appropriate on this claim.

**Hostile Work Environment**

Fletcher contends that she was verbally harassed at work because of her age. Specifically, she related the following examples in her Response to Island View's Motion for Summary Judgment:

> Over the course of two years, Fletcher was subjected to many, many age-biased comments that she found offensive and demeaning. Munoz [a previous supervisor] made comments asking Fletcher if she had her hearing aids on. Dugger, Munoz and Florence Sadourney (another shift manager) often referred to days when Ms. Fletcher and Phil [another employee who was over 50] worked as "seniors' day." Florence regularly asked Fletcher if she needed glasses, and commented to Fletcher and Nancy Kyle that "maybe you all need to get a walker." *Ex. A, Fletcher Depo. at 93-94.* These comments occurred on numerous occasions. *Id.* Dugger made statements including "did you take your geritol today?, "you got your hearing aid on?" and "get your glasses on." *Id. at 99.* Although Fletcher cannot pinpoint the exact number of times any of the statements were made, she testified that the "hearing aid" comments were made on "numerous" occasions and that all of the offensive comments were made "more than seven" times. *Id. at 110-112.* There were other occasions when managers made comments such as "when I get to be as old as you . . . ." *Id. at 115.*

Fletcher also referred to testimony from two other employees, Kyle and Whitten, to the effect that age-related remarks were not uncommon at Island View.

The Fifth Circuit has recently determined that a claim of hostile work environment may be raised in the context of an ADEA case. *Dediol v. Best Chevrolet*, 655 F.3d 435, 441 (5th Cir. 2011). Citing a similar case in the Sixth Circuit, the court in *Dediol* determined that a plaintiff may establish such a claim by showing:

> (1) [s]he was over the age of 40; (2) the employee was subjected to harassment, either through words or actions, based on age; (3) the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

*Id.* (citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996). To determine whether the complained of remarks or actions created a hostile work environment, the court looked to cases decided under Title VII. Thus, it determined, "A workplace environment is hostile when it is 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to alter the conditions of the victim's employment.'" *Dediol*, 655 F.3d at 441 (quoting *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009)). Even if the plaintiff perceives the workplace environment to be hostile, she must still show that it would appear so to a reasonable person. That test, objective unreasonability, depends on consideration of the following elements: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Dediol*, 655 F.3d at 441 (quoting *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007)).

In *WC&M*, the plaintiff was a practicing Muslim of Indian origin who was harassed by managers and other employees at a car dealership after the terrorist attacks of September 11, 2001. The incidents that he complained of included: inferring that he was involved in the terrorist attacks, being called "Taliban" or "Arab" multiple times a day, hearing a Taliban joke played on the sales floor speaker, being mocked for his dietary restrictions and need to pray during the workday, being told that he should "go back where you came from," and being told that he "was acting like a Muslim extremist" because he questioned being compelled to attend a United Way meeting. Additionally, one of the managers "banged" on the plaintiff's office partition every time he passed it, apparently with the intention of startling him. The plaintiff was fired after he complained about it. *WC&M,* 496 F.3d at 397.

In reviewing the plaintiff's claim, the court noted that both the severity and the intensity of the harassment should be considered in deciding whether the plaintiff has a viable claim; thus, "a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment." *Id.* at 400. Based on its review of the evidence, the court concluded that the plaintiff had established "a long-term pattern of ridicule sufficient to establish a claim under Title VII." *Id.* Using that case as an example, the court in *Dediol* confronted the facts of that case:

> Dediol claims that after his request to take off from work for the morning of July 4th, Clay [his manager] never again referred to him by his given name, instead calling him names like "old mother ******,"

23

"old man," and "pops." Clay would employ these terms for Dediol up to a half dozen times a day from on or around July 3, 2007, until the end of his employment [August 30, 2007]. Dediol also claims that "[Clay] stole a couple of deals from me[,]" and directed them towards younger salespersons. . . .

Clay disparaged Dediol's religion approximately twelve times over the two months leading up to Clay's [sic] departure. . . .

Clay also allegedly provoked fights with Dediol. On many occasions, there were incidents of physical intimidation and/or violence between Clay and Dediol. . . .

According to Dediol, by the end of July 2007, he requested permission from the Acting General Manager . . . to move to the New Car Department. . . . Yet, when Clay learned of Dediol's requested, Clay denied Dediol's transfer and stated, "Get your old f*****g ass over here. You are not going to work with new cars."

Tensions escalated and reached a climax at an office meeting on August 29, 2007. During an increasingly volatile exchange, Clay proclaimed, "I am going to beat the "F" out of you," and "charged" toward Dediol in the presence of nine to ten employees.

*Dediol,* 655 F.3d at 438-39

The court held that Dediol had satisfied the age requirement and had shown that he had been harassed because of his age. *Id*. at 441. Furthermore, both the frequency and severity of the occurrences established a jury issue as to whether the remarks and other incidents were objectively unreasonable, intimidating, hostile or offensive, under the test cited from *WC&M*. *Id*. at 442. In making that determination, the court compared Dediol's case to *Moody v. Sec'y of Army*, 72 F. App'x. 235 (5th Cir. 2003). There, the plaintiff attempted to support her age discrimination claim with direct evidence, citing remarks made to her by her supervisor. *Id*. at 238. Those remarks, which occurred over a thirteen-month

period, were, "Granny, have you not got anything to do?"; "See that old woman and she will take care of you"; "old woman, when are you going to retire and go home so someone younger can have a job?"; and "Granny, when are you going to retire and let someone younger have a job." *Id.* The court found that the plaintiff had not established the requisite nexus to any adverse job action for these remarks to be considered direct evidence of discrimination, nor were they "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 239 (quoting *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).

In this case, the comments about which Fletcher complains may have been somewhat more frequent than those in *Moody*, but they are nowhere near the frequency or severity of those in *Dediol* and *WC&M*. Nor were they accompanied by any other evidence of hostility. Nancy Kyle described the environment as "a picking atmosphere. . . . It was in humor." Fletcher herself testified that she responded to one of the remarks with, "Well, if you keep making remarks like that, you won't live to be as old as I am." As the Fifth Circuit has recognized, "'Although discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to support evidence of a Title VII violation, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges that can survive summary judgment.'" *Gobert v. Saitech, Inc.*, 439 F. App'x. 304, 307 (5th Cir. 2011) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347-48 (5th Cir. 2007)). This Court is of the opinion that no reasonable

factfinder could construe the evidence that has been presented on this claim to be of a level serious enough to constitute age harassment. Because there is no genuine issue of material fact that would support Fletcher's claim, summary judgment is appropriate.

**Defamation**

Fletcher's defamation claim stems from the evidence provided by Island View during the hearing on her unemployment benefits. Specifically, she refers to the testimony offered by both Dugger and Leighton that they had never smoked in an unauthorized area. In their depositions, which were taken later, they both admitted that they smoked in the "temporary tech shop" during 2006. Each of them said that they had forgotten that when they testified at the MDES hearing. Additionally, Fletcher complains about Ladner's submission of a summary of her disciplinary reports that contained an error as to the date of one of the events.

To prevail on a defamation claim, a plaintiff must prove: "(1) a false and defamatory statement concerning plaintiff; (2) unprivileged publication to [a] third party; (3) fault amounting at least to negligence on [the] part of [the] publisher; and (4) either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002). The threshold issue is whether the statement is false. *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998). A false statement is defamatory if it "'tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower

him in the confidence of the community.'" *Id.* (quoting *Fulton v. Miss. Publishers Corp.*, 498 So. 2d 1215, 1217 (Miss. 1986)).

Technically, these submissions to the MDES hearing officer were "false." The parties have based their arguments on the statutory grant of qualified immunity that attends MDES hearings. Miss. Code Ann. § 71-5-131 (1972 & Supp. 2011). That statute exempts any communications made during a MDES proceeding from a defamation charge unless they are false "and maliciously written, sent, delivered or made for the purpose of causing a denial of benefits under this chapter." The term "malice" has not been defined in this context, either by statute or case law. It cannot mean simply that the statement was made "for the purpose of causing a denial of benefits," as the statutory scheme contemplates that an employer may submit evidence to show willful misconduct. In the context of defamation, "malice" ordinarily means "ill will, a sentiment of hate or spite . . . with the design to willfully or wantonly injure another." *Barmada v. Pridjian*, 989 So. 2d 359, 364 (Miss. 2008) (quoting *Young v. Jackson*, 572 So. 2d 378, 385 (Miss. 1990)). The parties focus on their arguments for and against a finding of malice.

However, in the Court's opinion, a finding of whether there was malice, or whether the qualified privilege applies to these statements is unnecessary. These comments suffer from a more basic deficiency–they were not "defamatory." To be defamatory under Mississippi law, "(1) 'the words employed must have clearly been directed toward the plaintiff,' and (2) 'the defamation must be clear and unmistakeable from the words themselves and not be the product of innuendo,

27

speculation or conjecture." *Mitchell v. Random House, Inc.*, 865 F.2d 664, 669 (5th Cir. 1989) (quoting *Ferguson v. Watkins*, 448 So. 2d 271, 275 (Miss. 1984)); *see also Speed v. Scott*, 787 So. 2d 626, 631 (Miss. 2001) ("Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.").

Dugger's and Leighton's denials of smoking in an unapproved location were not directed toward Fletcher, nor would they have the effect of injuring her reputation. Fletcher admitted smoking in unapproved locations; she just denied doing it on the day that she was terminated. If Dugger and Leighton were untruthful during the hearing, that is another problem for another day, but it does not make their statements defamatory. Similarly, Ladner's clerical error on her summary of disciplinary actions is not defamatory. Regardless of whether Fletcher received the discipline in 2009 or 2010, it had no effect on her reputation. These statements simply cannot form the basis of a claim of defamation.

The only remaining issue is whether the submission of Leighton's statement regarding her confrontation with Fletcher at another casino constituted defamation. It did not. Fletcher admits that she ran into Leighton at the Treasure Bay Casino; the only difference between her story and Leighton's is the content of their communication. Both agree that Fletcher approached Melanie and spoke first. Fletcher alleges that she said, "Well Melanie, hey, how you doing?" She says that Leighton looked at her, but did not speak, and Fletcher said, "Oh, you're not going

28

to speak to me?"  Leighton claims that Fletcher said,  "I heard your stupid ass was here – I hope you can sleep at night Bitch – we have my unemployment hearing coming up so if you're ready to rumble Bitch we'll fucking rumble."

Fletcher claims that Leighton responded, "Pique [Fletcher's maiden name], don't you come around me starting no shit."  According to Leighton, she said, "What are you talking about?"  Fletcher says she ended the conversation with, "Melanie, I'm not the one that started anything.  I was just wondering if you sleep good at night."  Leighton says that Fletcher ended with, "It's on Bitch – I said what I needed to say."  Both of them agree that Fletcher walked away after the last exchange.

If Leighton's account of the story is untruthful, Fletcher has offered no argument as to how that version of the story has injured her reputation.  She cannot claim that Leighton's story has harmed her because it contained profanity.  At the time that Dugger told Fletcher that she was going to be fired for smoking in the public restroom, Fletcher admitted that she said, "You're fucking kidding me."  As she left his office, her last words were, "You've been after my fucking job for a while, and you know it."  The only other possibility is that Leighton's story, by including the invitation to "rumble," alleged a threat of physical violence that was defamatory.  A possibility, however, will not support a claim of defamation under Mississippi law, which strictly enforces the principle that "the defamation must be clear and unmistakable from the words themselves and not be the produce of innuendo, speculation or conjecture."  *Ferguson*, 448 So. 2d at 275.  *See, e.g.,*

*Chatham v. Gulf Publ'g Co., Inc.*, 502 So. 2d 647, 650 (Miss. 1987) (lounge owner could not recover from newspaper that published that a victim of a fight was discovered after police arrived at the lounge, when, in fact the fight occurred down the street, as a defamatory meaning was not clear and unmistakable).

At any rate, the presentation of this statement to the ALJ was privileged, as having been submitted as part of the hearing process. Ladner's testimony suggests that she sent the statement to the hearing officer in the ultimately mistaken belief that any material in her file relative to Fletcher should be produced. Fletcher has not submitted any credible evidence that the submission was malicious.

Finally, Fletcher has shown no injury from these statements. In a defamation case, a plaintiff must show "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Blake v. Gannett Co., Inc.*, 529 So. 2d 595, 602 (Miss. 1988) (citing *Chatham,* 502 So. 2d at 649). A defamation is actionable per se if it consists of:

> "(1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment. (2) Words imputing the existence of some contagious disease. (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof. (4) Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business; and in this and some other jurisdictions (5) words imputing to a female a want of chastity."

*Speed v. Scott*, 787 So. 2d 626, 632 (Miss. 2001) (quoting *W. T. Farley, Inc. v. Bufkin*, 159 Miss. 350, 132 So. 86, 87 (1931)). The word "thief," therefore, is not actionable per se, nor is the term "troublemaker." *Speed*, 787 So. 2d at 633;

*Mayweather v. Isle of Capri Casino, Inc.*, 996 So. 2d 136, 140 (Miss. App. 2008). Since the contention that Fletcher announced that she was willing to "rumble" is not actionable per se, she must show that she suffered special harm from the publication of Leighton's statement. She did not. Not only did the MDES hearing officer refuse to allow the statement to be introduced, she awarded Fletcher unemployment benefits after the hearing.

Fletcher argues that the delay in receiving benefits caused by the Department's initial rejection of her claim was the injury that she suffered. Obviously, for a tort to be actionable, there has to be a causal connection between the alleged wrongful conduct and the injury. *Palmer v. Anderson Infirmary Benevolent Ass'n.*, 656 So. 2d 790, 794-94 (Miss. 1995). There can be no such connection when the alleged injury occurs *prior* to the tortious conduct. In addition to the other reasons listed above, Fletcher cannot recover for defamation because she has suffered no injury therefrom.

## Conclusion

Fletcher has not produced any evidence that would create a genuine issue of material fact on the elements that she must prove to establish her claim of age discrimination, harassment based on her age, or defamation. For this reason, summary judgment for Island View is appropriate.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [Doc. #23] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Surreply in Opposition to Defendant's Motion for Summary Judgment [Doc. #32] is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that this action is hereby **dismissed with prejudice**. A separate final judgment dismissing this action with prejudice shall be entered in accordance with FED. R. CIV. P. 58.

**SO ORDERED AND ADJUDGED** this the 18th day of June, 2012.


*s/Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE